**WOFAC CORPORATION, a corporation formerly known as the Work-Factor Company, Inc., Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

Civ. No. 190–64.

United States District Court
D. New Jersey.

June 1, 1967.

W. Louis Bossle, Camden, N. J., for plaintiff.

David M. Satz, Jr., U. S. Atty., for New Jersey, Newark, N. J., by Robert Page, Asst. U. S. Atty., Camden, N. J., and Mitchell Rogovin, Asst. Atty. Gen., Donald R. Anderson and Herbert Grossman, Attorneys of Department of Justice, Washington, D. C., for defendant.

## OPINION

COHEN, District Judge:

Plaintiff, WOFAC Corporation,[1] a Delaware corporation, engaged in the management-consultant business, seeks refund of corporate income taxes paid, which it claims were improperly assessed in the amount of $26,371.17, together with statutory interest thereon. Jurisdiction is properly invoked pursuant to 28 U.S.C. § 1346(a) (1).

The matter was tried to the Court without a jury, therefore, the stipulations of facts, as supplemented by brief oral testimony offered primarily for the introduction of documentary exhibits, shall constitute the matrices of this opinion in lieu of findings of fact and conclusions of law required under F.R.Civ.P. 52.

Application for the refund was filed by the plaintiff corporation in February of 1959, for a claimed net operating loss for 1958, in the amount of $14,523.82, which it sought to apply to its net income for 1957 of $8,593.48, leaving the sum of $5,930.34 as a carryover deduction against income of succeeding years. The claim was rejected by the Internal Revenue Service; additionally, it examined the 1957 and 1958 returns and disallowed the corporation's accumulated net operating losses aggregating $38,595.71 and

---

1. The corporate antecedents and name changes are set forth herein.

the loss of $14,228.02 on the sale of its land, factory building, machinery and equipment that was claimed in its 1957 income tax return and as well, the sum of $435.75 of its 1958 net operating loss of $14,523.82, which was attributable to the sale of its inventory and which had been claimed on its 1958 income tax returns. The reasons assigned by the Internal Revenue Service for its disallowance of the net operating loss deduction, and for the loss claimed on the sale of the business property was that these losses were incurred in a business different from the one which had produced the profits sought to be offset.[2] The disallowance of the $435.75 portion of the 1958 net operating loss was ruled to be a loss sustained in the sale of material which represented the business activity of a corporation other than the taxpayer corporation which sought the deduction.[3] The determination was made that the losses were incurred by Warsaw Products, Inc., a New York woodworking corporation, whereas the taxpayer which sought deduction against its income was a Delaware corporation engaged in the management-consultant business, now known as WOFAC Corporation. Accordingly, the Internal Revenue Service made a deficiency assessment of $16,533.11 against plaintiff for the year 1957. Assessments made for this and subsequent years were paid and totaled the amount sued for.

These rulings gave rise to the present action to recover the amounts of taxes paid for 1957 and subsequent years that are attributable to the disallowance of deductions taken by the plaintiff corporation for the net operating losses sustained by it, prior to the transfer in 1957 to it of the management-consultant business.

While the parties have stipulated certain facts and events, the complexity of the legal issues involved prompts incisive treatment of the generic structure of the plaintiff corporation.

In 1951, four equal partners, James H. Duncan, William G. O'Brien, Joseph H. Quick, and George A. Goodwin owned a partnership located in New York City, New York, known as The Work-Factor Company which had engaged in a management-consultant business for a number of years.[4] Early in 1951, the partners learned of an opportunity to purchase the assets of a woodworking corporation known as the Warsaw Button Co., a New York corporation. Instead of purchasing and conducting the woodworking business through their partnership, the four partners formed a corporation on March 13, 1951 under the laws of the State of New York, known as Warsaw Products, Inc. The four partners became its sole stockholders and its capital stock was issued to them in equal shares. Because under New York law five directors were required, George A. Goodwin transferred a nominal part of his shares to qualify his wife.

In order to finance the purchase of the Warsaw Button Co., the assets of which totaled $50,000.00 (comprising inventory of raw materials $2,199.39; inventory of work in process $615.61; machinery and equipment $4,806.00; office equipment $279.00; land $2,600.00 and building $39,500.00),[5] the new corporation, War-

---

2. Stips. paras. 25, 26.

3. Stip. para. 26.

4. This type business in earlier years was called in the vernacular, "efficiency experts," and it pertained to job and employee performance improvements.

5. A supplemental stipulation, filed after submission of the case, of corporate tax returns of Warsaw Button Co., 80 South Main Street, Warsaw, New York, indicates net operating losses for the years 1948, 1949, 1950 and first half of 1951:

a) Year of 1949 return Serial No. CN-256, shows a net operating loss of $15,851.26 before any net operating loss carryover (item 32) and on page 3 thereof in summary questionnaire (item 3) a loss for 1948 of $17,904.71.

b) Year of 1950 return Serial No. CN-10038, shows a net operating loss of $82,796.75.

c) Year of 1951 return Serial No. CN-12967, shows a net operating loss of $5,525.34. This return was

saw Products, Inc., negotiated a loan with the Wyoming County Bank and Trust Company, of New York. On March 16, 1951, before any funds were advanced by the bank on a mortgage loan of the same date in the amount of $35,000.00, with a 5 year amortization term, the four partners, together with their respective wives, were required and did execute an agreement to guarantee payment of the mortgage loan with interest, severally to the extent of $3,750.00, and jointly in the aggregate, $15,000.00; the guarantee agreement also provided for the application of all mortgage payments first to the portion of the loan not so guaranteed, i. e. the unpaid balance.

The purchase of the woodworking business was effected and it was operated by the new corporation, Warsaw Products, Inc., during the remainder of 1951 and 1952. The anticipated ability of the corporation to operate the woodworking business at a profit did not materialize. Using the calendar year for its accounting base, for 1951 it showed a net operating loss of $11,418.55; for 1952 it showed another net operating loss in the amount of $10,808.03. In face of these losses, the woodworking activity, as such, was discontinued after 1952. Thereafter, the corporation sought to sell or rent its factory building, as well as its inventory, machinery and equipment. It was not able to do so at that time.

Unlike its failure in the woodworking venture, during the years of 1951 and 1952, the management-consultant partnership, the Work-Factor Company, prospered. In 1951 its gross income was $95,263.35, with a net distributable to the partners of $27,509.50; in 1952 its gross income was $151,784.71, with a net distributable of $59,891.16. And since the corporate assets of the discontinued woodworking business exceeded its liabilities and were a source of potential capital gain, the partnership advanced various sums of money to it during 1953 aggregating $5,500.00 with which it paid its accruing debts for interest, taxes, insurance and for the amortization of its mortgage, as the individual partners and their wives had guaranteed, as stated above, a portion of the unpaid balance of the mortgage loan. (See 26 U.S.C. § 1231, infra Capital gain and ordinary loss.)

So also in the years 1953, 1954, 1955 and 1956, the corporation continued its endeavors to rent or sell its assets, but unsuccessfully; the partnership continued to advance money to it to meet its current and accruing obligations. In 1954 the advances aggregated $6,833.55; in 1955, $4,685.00; and in 1956, $3,037.50, all by way of partners' loans to the corporation.

In 1955, it was known to all the partners that one of them, Goodwin, would be withdrawing from the partnership at the end of that year, so that none of the advances made to the corporation by the partnership was charged to his capital account, as in prior years, and as was done in regard to the other three part-

for the period of January 1, 1951 to May 25, 1951, and the summary questionnaire (item 3) shows a total deficit of $116,552.72. A further notation was also inserted as follows:

"The Warsaw Button Co., the Taxpayer herein, was dissolved on July 26, 1950 by the filing of a Certificate of Dissolution with the Secretary of the State of New York. It has since been engaged in disposing of its assets and paying its creditors. Certain of its assets were sold in 1950 and reported in its return of that year. On March 16, 1951 all of its remaining assets consisting of Building, Land, Wood Machinery and Furniture and Fixtures were sold for a total sale price of [$]51,894.70, without allocation of the sale price. The corporation is conducting no further business operation of any kind and this is the final return."

N. B. The above tax return information was submitted at the request of the Court, and it is to the credit of both counsel that they agreed to do so without knowledge of what would be disclosed or its effect, if any, upon their respective positions.

ners. The loans made during 1955 amounted to $4,685.00 and were charged to the accounts of the other three partners. When Goodwin withdrew during that year, his withdrawals at that time equated his capital contributions and nothing more was then due to him.

On January 1, 1956, the remaining three partners formed a new partnership, and the loans to the corporation still being outstanding, the capital accounts of the three remaining partners were adjusted to charge them respectively with one-third of the aggregated advances for the years 1953 to 1955 inclusive.

Warsaw Products, Inc. continued to flounder during the years 1953, 1954, 1955 and 1956, showing net operating losses for those years, respectively, of $8,156.36; $3,987.14; $6,870.01 and $6,774.17.

On March 1, 1957 Goodwin sold all of his capital stock in the corporation to the partnership then composed of his three former partners, including the qualifying nominal shares which he had transferred to his wife.

At, or about, the time that the Goodwins' stock purchase was made by the partners, the latter sought legal advice and thereafter decided to incorporate the partnership's management-consultant business. Rather than form a new corporation, as they already owned the inactive woodworking corporation, they decided to transfer the partnership assets and business to their own corporation, of which they were the sole stockholders.

The partnership balance sheet prepared as of March 31, 1957 stated the gross assets as $65,101.12, liabilities $20,103.84, with a resulting net worth of $44,997.28 (of which $20,103.84 comprised partnership's loans to Warsaw Products, Inc.) in unequal capital account proportions, as to each one. During this same period, they advanced an additional $2,500.00. All of the partnership business, as well as its assets and liabilities, was transferred to the corporation, but the corporation liquidated its loans from the partnership by payment to the individual partners. The factual consequence of the transfer was that Warsaw Products, Inc. obtained additional assets and liabilities, but the assets were more than sufficient to offset the liabilities. Thereafter, the corporation name was changed from Warsaw Products, Inc. to The Work-Factor Company, Inc.; the three equal partners and sole owners of the corporation ceased functioning as a partnership, and together with their former partnership employees confined their business operations to the management-consulting enterprise.[6]

On June 30, 1957, after the mortgage loan had run its full term, the corporation finally sold its land, factory building and part of its machinery and equipment at a net loss of $14,228.02.

6. Stip. para. 18: "At the time of that transfer, the three partners were also the sole stockholders of Warsaw Products, Inc. In preparation for the transfer both the stockholders and the board of directors of the corporation had meetings on March 20, 1957. As a result of those meetings, the following acts, inter alia, were accomplished: The name of the corporation was changed from Warsaw Products, Inc. to The Work-Factor Company, Inc.; a capital stock control agreement was entered into between the corporation and its three stockholders; one Albert Rice was elected director although he was not a stockholder; the charter of the corporation was amended to authorize it to carry on the business of the partnership; the by-laws of the corporation were amended accordingly; the three stockholder-partners were elected officers; and the salaries of the three stockholder-partners were fixed for the remainder of 1957."

Stip. para. 19: "In consummating the transaction, the corporation paid nothing for the partnership business either by way of issuance of additional capital stock or other consideration. The only adjustment to the capital stock account after the transfer, which had been carried at $37,894.70, representing 378.947 shares as of December 31, 1956, was to reduce the value of the stock to $36,000.00 and to set up the difference of $1,894.70 as paid-in or capital surplus.

As of December 31, 1957 the net operating losses of the corporation for the five consecutive preceding years aggregating $38,595.71 were as follows:

Net loss for year 1952 .......$10,808.03

Net loss for year 1953 ....... 8,156.36

Net loss for year 1954 ....... 6,987.14

Net loss for year 1955 ....... 6,870.01

Net loss for year 1956 ....... 5,774.17

Total ....................$38,595.71

On December 31, 1957 the corporation had a net income of $61,417.21 before charging losses, against which it charged $14,228.02, being the net loss on the factory property, and $38,595.17, being the five year aggregated net operating loss of the woodworking business, leaving a net taxable income, after losses, of $8,593.48 upon which it paid an income tax of $2,578.04.

On December 30, 1957 the three stockholder-partners formed a new corporation in the State of Delaware, also known as The Work-Factor Company, Inc. On January 1, 1958 all of the assets and liabilities of the New York corporation bearing the same name were transferred to the new Delaware corporation, and the New York corporation was dissolved. The Delaware corporation filed the requisite income tax return, utilizing the loss figures set forth above and paid the taxes due.

For the calendar year 1958, the new corporation's return showed a net operating loss of $14,523.82. Of that loss, $435.75 was attributable to the sale of the woodworking business inventory for $264.25, when it had cost $700.00. The remaining portion of the stated loss was attributable to the operation of the management-consultant business.[7]

In February, 1959 the corporation filed a claim for refund with the Internal Revenue Service regarding its 1958 net operating loss. It claimed a carryback of $14,523.82, as its net operating loss, against its 1957 net income of $8,593.48, leaving the sum of $5,930.34 as a carryover to succeeding years. It also claimed a refund of the $2,578.04 income tax which it had paid for the taxable year of 1957.[8]

Also, in 1959, the corporation had a net income of $8,667.93 against which it charged its 1958 net operating loss carryover of $5,990.24, leaving a balance of $2,737.59 as its net taxable income on which it paid a tax of $821.28.[9]

In 1960, the corporation reported a net operating loss of $4,190.64 and filed a claim in March 1961 for refund claiming a carryback of its net operating loss for 1960, of $4,190.64, to its net income for 1959 of $2,737.59, leaving the sum of $1,453.05 as a carryover to succeeding years. It also claimed refund of $821.28 income tax which it had paid for 1959. Of course, the claimed net operating losses also affected tax returns for subsequent years.[9a]

Not only were the claimed refunds rejected, but the charged net operating losses were disallowed and a deficiency assessment of $16,533.11 for the year 1957 entered against the corporation.

The government bases its rejection of claims for refunds, as well as its disallowance of net operating losses, on the ground that the losses claimed were not incurred by the same business which had produced the profits, there having been a *de facto* dissolution of the woodworking business in or after 1952, as well as a lack of continuity of business enterprise and, further, that the sale of inventory was a sale of capital assets not used in the trade of the taxpayer or its management-consultant business, hence not an ordinary loss deduction. Another contention is made that the purchase of the partnership assets was an "acquisition of corporate control" within the meaning of the tax laws which was calculated in effect to evade

7. Stip. para. 24; 1958 Return, P–21.

8. Stip. para. 25.

9. Stip. para. 30.

9a. Stip. para. 37, Partnership Returns, years 1951–1956; Corporation Returns, years 1951 to 1961, inclusive in evidence.

or avoid income taxes, within the prohibition of Section 269 of 26 U.S.C.

The plaintiff corporation premises its claim for refund on the fundamental proposition that it is the intention of Congress to permit a single corporation, where its stockholders remain the same, to offset its lean years against its lush years, in order to ameliorate the drastic tax consequences of a strictly annual tax accounting basis, and that the plaintiff was within the spirit of such intention as evidenced by the evolution of the legislation. It contends that mere commencement of a different corporate enterprise or activity, where corporate ownership remains the same, does not bar the application of the net operating loss deduction resulting from its prior activity or type of productivity; further, that the change from a New York to a Delaware corporation is of no tax significance; nor were the fortuitous corporate structural changes such as to bring the plaintiff within the prohibition of tax avoidance, or evasion. The additional argument is made that plaintiff's ordinary loss treatment of the sale of its physical assets was proper, as they were acquired and used in its trade and business, even though there followed a cessation of that particular enterprise and that such cessation did not effect an abandonment or *de facto* dissolution of the corporation.

The issues generated for resolution by the Court are:

1. Was the plaintiff entitled to the claimed net operating losses under Section 172 of the 1954 Internal Revenue Code?

2. Does the judicial doctrine of *Libson Shops,* infra, defeat the carryover privilege?

3. Does Section 382 of the 1954 Internal Revenue Code defeat the carryover privilege?

4. Were plaintiff's losses on sales of assets entitled to *ordinary loss* or capital loss treatment?

5. Was the plaintiff's corporate identity destroyed by *de facto* dissolution, or subsequent re-incorporation in another state, thus, as a tax consequence, dissipating its prior losses?

6. Assuming the carryover privilege was not defeated by any of the foregoing, was there in fact an intent to evade or avoid taxes by the plaintiff within the proscription of Section 269 (formerly Section 129 of the 1939 Code) of the 1954 Internal Revenue Code?

These issues framed in the maze of distinctions so characteristic of the tax laws are not without complexities. Changing sequence for convenience, the last issue shall be considered first. For if it is resolved against the plaintiff, the others need not be reached for disposition of the case.

■■■ Section 269 of the Internal Revenue Code of 1954 [10] was legislatively designed to prevent acquisition of ownership of another business legal en-

---

10. Section 269(a), 26 U.S.C. (formerly § 129(a) of the 1939 Code)
Acquisitions made to evade or avoid income tax
(a) In general.—If—
(1) any person or persons acquire, * * * control of a corporation, or
(2) any corporation acquires * * * property of another corporation, not controlled * * * immediately before such acquisition, by such acquiring corporation or its stockholders * * * and the principal purpose for which such acquisition was made is evasion or avoidance of Federal income tax by securing the benefit of a deduction, credit, or other allowance which such person or corporation would not otherwise enjoy, then the Secretary or his delegate may disallow such deduction, credit, or other allowance. * * * [C]ontrol means the ownership of stock possessing at least 50 percent of the total combined voting power of all classes of stock entitled to vote or at least 50 percent of the total value of shares of all classes of stock of the corporation."
The statute has been amended in part, but the changes made are not material to the present case.

tity as a maneuver to evade or avoid income taxes. Southland Corporation v. Campbell, 358 F.2d 333, 336 (5 Cir. 1966); 2 Rabkin & Johnson, Fed. Income, Gift and Estate Taxation, § 11.05 (1965). The legislation has a "built-in" presumption of intent to evade or avoid tax if there has been, in fact, an *acquisition of control,* the *principal purpose* of which is to secure the benefit of a deduction, credit or allowance to which the claimant would not otherwise be entitled. Such a proscription obtains regardless of whether a "profit" corporation acquires a "loss" corporation against which to offset losses against profit, or a "loss" corporation acquires a "profit" corporation. F. C. Publication Liquidating Corp. v. Commissioner of Internal Revenue, 304 F.2d 779 (2 Cir. 1962). Julius Garfinckel & Co., Inc. v. C. I. R., 335 F.2d 744 (2 Cir. 1964). Cf: Alprosa Watch Corp., 11 T.C. 240 (1948). But acquisition of control of one *corporation* by another *corporation* cannot arise where, as in the instant case, the stockholders were the sole owners of both the surviving *corporation* and the absorbed *partnership.* At the time of the transfer of the profitable partnership business to the loss-experience corporation, the stockholder-partners owned both. So that the "acquisition of control" element of Section 269 was not met.

■ The only "acquisition of control" during the history of the plaintiff, within the meaning of Section 269, was the purchase of Warsaw Button Co. in 1951. Good and valuable consideration was paid for that purchase and substantial assets of $50,000.00 were acquired. This transaction of itself did not produce any tax benefit or advantage to Warsaw Products, Inc., for no attempt was made to use pre-acquisition losses. The further step, some six years later in 1957, was necessary before concepts of tax advantage or benefit, as sought here, could arise. It was during this period that Warsaw Products, Inc. incurred these post-acquisition losses for the years 1952 to 1956 inclusive. However, if it can be reasonably inferred under the facts and circumstances of this case that the acquisition of Warsaw Button Co. in 1951 was an integral component of one plan ultimately to be consummated in 1957 by the absorption of the partnership, in order to *build* losses to offset the partnership profits and thus secure the benefit of a deduction not otherwise available to the *partners,* then Section 269 might apply. J. T. Slocomb Co. v. Commissioner of Internal Revenue, 334 F.2d 269 (2 Cir. 1964); Southland Corp., supra. Application of Section 269 in such circumstances requires this essential statutory requisite—a principal purpose of tax evasion or avoidance. The issue of "principal purpose" is one of fact, in civil law, not the *malum mens rea* familiar to the criminal law. Cf. *Southland Corp.,* supra, 338 F.2d at page 337.

■ Despite the complex structural history of the taxpayer corporation, now known as WOFAC ("like Topsey, it just growed"), the conclusion that there was not such a nefarious plan is bolstered by consideration of several salient facts: First, no tax benefit was obtained until 1957, six years after the initial purchase; second, the post-acquisition losses sought as deductions were economically realistic in that they involved cash expenditures (obtained by way of loans) to meet fixed current expenses for each of the years in question; and, third, the short-lived operation of the woodworking venture demonstrated that the new owners thereof were better teachers in business management than they were practitioners in an unfamiliar activity, nevertheless, their money and credit, as well as the guarantees of their respective wives were already spent and pledged, although experience proved that they had guessed wrong. For when the mortgage loan was finally liquidated at the end of its term, the personal guarantors jointly paid $6,364.82, with interest, as their portion of the obligation. They had no choice but to maintain the corporate assets until they could effect a sale, an event which did come about ultimately, but not without difficulty. There was an

active business purpose, as well as a realistic economic motive, to sustain the corporation, which factors were manifest in these circumstances; and, conversely, it does not clearly appear that there was a mere retention of a "corporate shell" awaiting subsequent favorable tax circumstances. That such favorable tax climate may have come about eventually, when on June 22, 1954, Sections 381 and 382 of the Code became effective, is a fortuitous circumstance. So that it is found as a matter of fact, that there was no intent to evade or avoid taxes by the acquisition of Warsaw Button Co., within the meaning of the Internal Revenue Code. Cf: Southland Corp., supra.

However, Section 269 must also be viewed in light of the union in 1957 of Warsaw Products, Inc. and The Work-Factor Company, partnership, both of which were owned by the same persons in the same proportions. Clearly, tax advantage was being sought in that instance, because of the enactment of Section 382 in 1954. But, the requisite of "trafficking" in losses of corporations by purchase is utterly lacking. Under all the facts and circumstances of this case, I conclude that it was not prohibited.

Looking then to the statutory conditions for disallowance, the legislative limitations of Section 382,[11] in the parts

---

11. Sec. 382. (26 U.S.C. § 382) "Special limitations on net operating loss carry-overs.

 (a) Purchase of a corporation and change in its trade or business.—

 (1) In general.—If, at the end of a taxable year of a corporation—

 (A) any one or more of those persons described in paragraph (2) own a percentage of the total fair market value of the outstanding stock of such corporation which is at least 50 percentage points more than such person or persons owned at—

 (i) the beginning of such taxable year, or

 (ii) the beginning of the prior taxable year,

 (B) the increase in percentage points at the end of such taxable year is attributable to—

 (i) a purchase by such person or persons of such stock, the stock of another corporation owning stock in such corporation, or an interest in a partnership or trust owning stock in such corporation, or

 (ii) a decrease in the amount of such stock outstanding or the amount of stock outstanding of another corporation owning stock in such corporation, except a decrease resulting from a redemption to pay death taxes to which section 303 applies, *and*

 (C) such corporation has not continued to carry on a trade or business substantially the same as that conducted before any change in the percentage ownership of the fair market value of such stock,

the net operating loss carryovers, if any, from prior taxable years of such corporation to such taxable year and subsequent taxable years shall not be included in the net operating loss deduction for such taxable year and subsequent taxable years.

 (2) Description of person or persons.—The person or persons referred to in paragraph (1) shall be the 10 persons (or such lesser number as there are persons owning the outstanding stock at the end of such taxable year) who own the greatest percentage of the fair market value of such stock at the end of such taxable year; except that, if any other person owns the same percentage of such stock as is owned by one of the 10 persons, such person shall also be included. If any of the persons are so related that such stock owned by one is attributed to the other under the rules specified in paragraph (3), such persons shall be considered as only one person solely for the purpose of selecting the 10 persons (more or less) who own the greatest percentage of the fair market value of such outstanding stock.

 (3) * * *

 (4) Definition of purchase.—For purposes of this subsection, the term 'purchase' means the acquisition of stock, the basis of which is determined solely by reference to its cost to the holder thereof, in a transaction from a person or persons other than the person or persons the ownership of whose stock would be attributed to the holder by application of paragraph (3)." (Italics supplied.)

here pertinent, impose two conjunctive elements: a) change in ownership of more than 50 percentage points by acquisition of control through purchase; *and* b) failure to continue to carry on a trade or business substantially the same as that conducted before any change in the percentage of ownership of the fair market value of the majority of such stock. (§ 382(a) (1) (C)).[12]

■ The decision in Libson Shops, Inc. v. Koehler, 353 U.S. 382, 77 S.Ct. 990, 1 L.Ed.2d 924 (1957), involved the law under the 1939 Code as it existed prior to 1954. See: Maxwell Hardware Company v. C. I. R., 343 F.2d 713 (9 Cir. 1965); Frank IX & Sons Virginia Corporation v. C. I. R., 375 F.2d 867 (3 Cir. April 12, 1967). The law in effect on March 31, 1957, when all of the partnership's assets (except the accounts receivable) were transferred by The Work-Factor Company to the loss corporation, Warsaw Products, Inc., must control. Frank IX & Sons Virginia Corporation, supra. The *Libson Shops* doctrine enunciating the law as it applied to transactions prior to the 1954 Code turned principally on the test of whether the acquiring corporation *continued to carry on substantially the same trade or business,* without regard to a change in ownership or common ownership of the transferor and transferee. The theory underlying the *Libson Shops* judicial doctrine, as well as the legislative intent and purpose of the 1939 and 1954 Code provisions for loss carryovers, was designed to aid the single business for a period of fluctuating income involving profit and loss years, and not to give unique tax advantage to common owners of separate, legally distinct corporate entities. See: Frank IX & Sons Virginia Corp., supra. The plaintiff contends, however, that the *Libson Shops* interpretation of the 1939 Code is superseded because Section 172(a) of the 1954 Code, is a general provision authorizing the deduction of net operating losses which are carried over from former years, while Sections 381 and 382 deal with corporate acquisitions and impose special limitations on net operating loss carryovers. Section 381 pertains to certain tax-free reorganizations between corporate entities; Section 382, on the other hand, establishes two limitations in the *conjunctive* for the utilization of a net operating loss of a transferee corporation: (1) if there has been a change of fifty percentage points or more in the ownership of the total fair market value of the outstanding stock of the corporation among any one or more of the ten persons who own the greatest percentage of the stock; *and* (2), if the corporation seeking to invoke the tax advantage of Section 172(a) has failed to carry on substantially the same trade or business as that which was conducted before the change in ownership. When these conditions co-exist, then a loss carryover is completely disallowed. While not pertinent here, § 382(b) (3) provides for proportionate reduction in the amount of loss carryover, where after a reorganization the shareholders of the loss corporation thereafter own less than 20% of the fair market value of the outstanding stock of the acquiring corporation, but even then, the reduction of the loss does not apply, if the transferor and transferee corporations are owned substantially by the same persons in the same proportions.[13] While the Court of Appeals was not required in *Frank IX & Sons,* supra, to determine to what extent, if any, §§ 381 and 382 might be legislative substitutes for the judicial doctrine of *Libson Shops,* the facts *sub judice* squarely confront us with that precise issue.

■ We have here more than the mere survival of a loss corporation, but less than a reorganization of corporations owned substantially by the same persons

---

12. Footnote 11, ante.

13. See: Net Operating Loss Carryovers and Corporate Adjustments: Retaining an Advantageous Tax History under Libson Shops and Sections 269, 381 and 382, 69 Yale L.J. 1201, 1238–1267 (1960) for a discussion in depth.

in the same proportions. The common owners of both enterprises, unless the loss corporation was *de facto* dissolved and legally non-existent, as argued by the government, transferred their profitable business to their own loss corporation, without any change in ownership (§ 382 (a) (1)), and the loss corporation itself thereafter conducted the profitable business enterprise of the former partnership. While there were separate business enterprises and distinct legal entities, tax-wise the economically responsible individuals were identical. The failure to carry on substantially the same trade or business of the loss corporation (woodworking), or to reactivate it before the transfer here in question, might well defeat the loss carryover under the *Libson Shops* doctrine, without regard to the element of unchanged ownership under the 1939 Code. However, Congress has imposed two elements in the 1954 Code to disallow the net operating loss: a) change in ownership of more than 50 percentage points *and* b) failure to carry on substantially the same trade or business.[14] Therefore, it is concluded as a matter of law that *Libson Shops* does not control the present case, rather, it turns on the key legislative conditions of Section 382 of the 1954 Code. *Maxwell Hardware Company*, supra; *Southland Corporation*, supra. This is not to say that it is the opinion of this Court, that the rationale of *Libson Shops* has been legislatively superseded for all purposes. Such a sweeping declaration is not the province of a trial court seeking to reach a determination upon a particular set of facts and on a dispositive specific issue generated thereby. In enacting Section 382(a) (1) (A), (B), (C) of the 1954 Code, we must assume that Congress purposefully used the conjunctive rather than the disjunctive when it required the percentile points of ownership change *and* the change in business enterprise, thus foreclosing a ruling based upon the latter change alone.

Most, if not all, of the reported cases bearing upon carryover privileges for losses and profits have been cited and discussed in the respective briefs of counsel.[15] None of these cases squarely simulate the present facts. The nearest, perhaps, is that of Alprosa Watch, 11 T.C. 240 (1948), a case which has received much criticism from those who have followed the subsequent maze of metaphysical distinctions employed in tax cases. The present case appears to fit snugly into the issue reserved in *Libson Shops* in footnote 9, 353 U.S. at page 390, 77 S. Ct. at page 994,[16] and by the Court of Appeals for this Circuit in *Frank IX & Sons Virginia Corporation*, supra. Certain of the outstanding decisions on net operating loss problems are reviewed in the excellent opinion of Judge Coolahan, of this District Court, in Commercial Industries Corp. v. United States, 268 F.

---

14. Rev.Rul. 63–40, 1 R. B. 1963–12, 8 [1954 Code Secs. 172 and 382] "Net Operating loss deductions: Carryover after merger.—Where there has been no change in the stock ownership of a corporation during or after a period in which it incurred losses, the Internal Revenue Service will not rely on the rationale of Libson Shops, Inc., 57–1 USTC ¶ 9691, 353 U.S. 382, [77 S.Ct. 990, 1 L.Ed.2d 924] (1957), Ct.D.1809, C.B. 1957–2, 891, to bar the corporation from carrying over the losses under 1954 Code Sec. 172 against income from a new business enterprise, acquired through a cash purchase of assets at their fair market value, solely because the losses are attributable to a discontinued corporate activity." 637 CCH—Standard Federal Tax Reports ¶ 6315.

15. For a history see: Wisconsin Central R. Co. v. United States, 296 F.2d 750, 155 Ct.Cl. 781 (1961) cert. den. 369 U. S. 885, 82 S.Ct. 1157, 8 L.Ed.2d 286 (1962).

16. "9. We do not pass on situations like those presented in Northway Securities Co. v. Commissioner, 23 B.T.A. 532; Alprosa Watch Corp. v. Commissioner, 11 T.C. 240; A. B. & Container Corp. v. Commissioner, 14 T.C. 842; WAGE, Inc., v. Commissioner, 19 T.C. 249. In these cases a *single* corporate taxpayer changed the character of its business and the taxable income of one of its enterprises was reduced by the deductions or credits of another." (Emphasis within the reference.)

Supp. 52, decided April 14, 1967. Reiteration here would serve no useful purpose. However, as stated therein, p. 58:

> "The varied situations presented in the decisions following *Libson Shops* have included many kinds of corporate changes: some involved discontinuity in the identity of the taxpayer; some a discontinuity in the line of endeavor; some a change of beneficial ownership; and some the juxtaposition of one business unit's losses against the profits of another. More often than not, they have involved a combination of more than one type of discontinuity.

> "Nevertheless, I have concluded that in each instance it was some basic change in the structure of the loss corporation as an identifiable business unit, either through formal reorganization or through interaction with other corporations, which precipitated the Commissioner's scrutiny. In those cases where the carryover or carryback ultimately was denied, the *Libson* test of business enterprise continuity was applied primarily because the profits and the losses were earned by sufficiently different business units, and it was only the merger or reorganization which created an opportunity for their set-off."

Such judicial emphasis upon corporation shifting of control across distinctive corporate business entities has been the central prohibitory theme of the decisions. The fundamental philosophy emanating from the *Libson Shops* line of cases and reiterated in *Frank IX & Sons Virginia Corporation*, supra, is to prevent strangers from reaping the benefits, of tax losses acquired through purchase or by reason of certain corporate mergers of distinct corporate entities, which

are not consonant with equitable considerations of tax relief to the single corporate taxpayer. We do not have such corporate shifting of control in the instant case.

 Another proposition of the government, in resisting refund, is based upon its contention that the net operating loss was disallowed because the loss corporation did not exist after its *de facto* dissolution, so that its net operating losses of 1951–1952, as well as those for subsequent years, died with it; further, that the stockholders maintained a mere "corporate shell" to advantage themselves of a deduction, credit, or other allowance which such person or corporation would not otherwise enjoy. *Cf*: United States v. Fenix, 360 F.2d 260 (10 Cir. 1966), app. pend. 386 U.S. 1036, 87 S.Ct. 1474, 18 L.Ed.2d 599. It argues that maintenance of a mere "corporate shell" brings the plaintiff within the interdiction of Section 269(a) of the 1954 Code, aside from any considerations of a plan or scheme to evade or avoid taxes, because there being no corporation in fact, the seeking of the tax benefits after the partnership transfer of a profitable business can have only one motivation—that is to evade or avoid taxes. So far as plan or scheme, this Court has found both as a fact and as a matter of law that no such disqualifying principal purpose for the acquisition of the woodworking company existed.[17] Insofar as the partnership transfer, unless there was in fact a dissolution of the loss corporation, the net operating losses were proper allowances for the reasons stated above. In resolution of the issue of *de facto* dissolution, it has been found as a fact that the loss corporation continued as an active, affirmatively functioning corporation for very compellingly realistic economic purposes. It was originally sought as a

---

17. *Cf*: Zanesville Investment Co. v. C. I. R., 335 F.2d 507 (6 Cir. 1964) reversing 38 T.C. 406, where a corporation was entitled to off-set *post-acquisition* losses of an acquired business against its own income where such losses were not "built in," but were economically incurred after acquisition, even though they were anticipated as part of a long-range development program. *Vide:* Kershaw Mfg. Co., T.C. Memo., 1965–44, allowing a loss carryover even though the principal purpose of a merger was to use the loss carryover, when in fact the acquisition of control was not primarily for tax avoidance.

business facility, but when this enterprise proved futile, the owners, already being absolutely committed both corporately as stockholders and individually as guarantors, had no choice but to feed the monster by way of loans to meet their current obligations in order not to lose all equity investment and to protect their personal guarantees for the full term of the mortgage (5 years) which had facilitated the original purchase, as well as to avoid potential deficiency judgments in the event of corporate default. This is certainly not the maintenance of a mere "corporate shell" denounced in Commissioner of Internal Revenue v. Virginia Metal Products, 290 F.2d 675 (3 Cir. 1961) ; here, there was economic substance rather than formalisms. That the stockholders eventually reaped a so-called "windfall" after the passage of the 1954 Code was fortuitous and not, of itself, violative of the tax law. *Maxwell Hardware Company*, supra, 343 F.2d at p. 723.

Treasury Rev.Rul. 61–191, CB, 1961–2, p. 251 provides definitive statement of what constitutes a *de facto* corporate dissolution:

> "Net operating losses sustained or excess profit tax credits remaining unused by a corporation subsequent to the date that it is de facto dissolved may not be carried back to prior taxable years. For the purpose of such carrybacks, a de facto dissolution occurs when a corporation has disposed of all or most of its operating assets; terminated its business activities, and became a mere shell, a corporation in name and semblance only, without real corporate substance, serving no real corporate purpose, and having no valid or compelling reason for continuing its existence, even though not formally dissolved."

Sales made by the loss corporation during the years 1951 through 1953 of machinery equipment totaled $1,120.50, while the remaining assets aggregated $45,011.15 and remained intact until 1957. The corporation had continued to meet its mortgage debt and to pay its taxes, insurance, and franchise fees as well as file its tax returns. The enterprise may have proved a bad bargain but the corporation continued conscientiously to meet its obligations as they occurred, through loans from its owners' partnership. It was not engaged in liquidating, nor winding up its affairs as argued by the government. For it was not until June 24, 1957 that the land and factory building were sold and the proceeds paid to the bank, together with the mortgage deficiency of $6,364.82 and interest, as required by the individual guarantees. Cf: C. I. R. v. Allegheny Broadcasting Corp., 179 F.2d 844 (3 Cir. 1950) ;. Jos. Capps, Inc. v. United States, 86 F.Supp. 712 (D.C.S.D.Cal.1949). The case of American Well & Prospecting Company v. C. I. R., 232 F.2d 934 (3 Cir. 1956), cert. den. 352 U.S. 840, 77 S.Ct. 61, 1 L. Ed.2d 57 (1956), relied upon by the government is inapposite. In that case there remained simply a corporation shell. In Continental Sales & Enterprises, Inc. v. United States, 11 AFTR 2d 1656 (D.C. N.D.Ill.1963) cited in the government's brief, everything had been liquidated except a net operating loss deduction, and this was certainly not a *corporate asset* utilizable in the subsequent merger with two other corporations.

In addition to keeping the corporation alive during the loss years, the owners had no intention, either explicit or implicit, to dissolve; literally, they could not afford to under the circumstances above recited.

 With respect to the question of plaintiff's corporate identity, challenged by the government, the change of the New York corporation to the Delaware corporation was a mere change of domicile, and under the ruling of Newmarket Mfg. Co. v. United States, 233 F.2d 493 (1 Cir. 1956), cert. den. 353 U.S. 983, 77 S.Ct. 1279, 1 L.Ed.2d 1142 (1957), had no greater tax significance than a like change of domicile by an individual

taxpayer. As stated at page 498 of that opinion:

" * * * [T]axation is an intensely practical matter, which ought to turn upon economic realities rather than upon technical differences of the corporate entity consequent upon the migration of a corporation from one state to another."

Turning to the final issue that of whether the plaintiff was entitled to "ordinary loss" treatment in its disposition by sale at a loss of its land, building, and inventory, this Court concludes that it was so entitled. The relevant sections of the 1954 Code are §§ 1221 and 1231, the former defines capital assets [18] and

excludes depreciable property and real estate, while the latter specifically deals with part of such property as is used in the trade or business of the taxpayer.[19] The property in question consisted of the land, factory building, equipment, machinery, and unused inventory previously used in the idled woodworking business. The taxpayer contends that $14,228.02 represented the difference between its adjusted basis of $32,627.25 and the net sales price in June, 1957 of $18,339.23. The Government counters that the property producing the loss was a capital asset in that it was not used in the trade or business of the taxpayer-corporation, i. e. the management-consulting business, and hence, the loss must

---

18. 26 U.S.C. 1221: Capital Asset Defined.
 "For purposes of this subtitle, the term 'capital asset' means property held by the taxpayer (whether or not connected with his trade or business), but does not include—
 (1) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business;
 (2) property, used in his trade or business, of a character which is subject to the allowance for depreciation provided in section 167, or real property used in his trade or business;"

19. SEC. 1231. Property used in the Trade or Business and Involuntary Conversions.
 "(a) General Rule.—If, during the taxable year, the recognized gains on sales or exchanges of property used in the trade or business, plus the recognized gains from the compulsory or involuntary conversion (as a result of destruction in whole or in part, theft or seizure or an exercise of the power of requisition or condemnation or the threat or imminence thereof) of property used in the trade or business and capital assets held for more than 6 months into other property or money, exceed the recognized losses from such sales, exchanges, and conversions, such gains and losses shall be considered as gains and losses from sales or exchanges of capital assets held for more than 6 months. If such gains do not exceed such losses, such gains and losses shall not be considered as gains and losses

from sales or exchanges of capital assets. For purposes of this subsection—
 (1) in determining under this subsection whether gains exceed losses, the gains described therein shall be included only if and to the extent taken into account in computing gross income and the losses described therein shall be included only if and to the extent taken into account in computing taxable income, except that section 1211 shall not apply; and
 "(2) losses upon the destruction, in whole or in part, theft or seizure, or requisition or condemnation of property used in the trade or business or capital assets held for more than 6 months shall be considered losses from a compulsory or involuntary conversion.
 (b) Definition of Property Used in the Trade or Business.—For purposes of this section—
 (1) General Rule.—The term 'property used in the trade or business' means property used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 167, held for more than 6 months, and real property used in the trade or business, held for more than 6 months, which is not—
 (A) property of a kind which would properly be includable in the inventory of the taxpayer if on hand at the close of the taxable year,
 (B) property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business, or
 (C) * * *"

be treated as a capital loss; furthermore, since the corporation had no capital gains during the years in suit to be offset by such capital losses, the allowable capital loss would not affect any of the taxes for which the taxpayer claims a refund.

■ It is the conclusion of this Court that the property in question is legislatively excluded from the statutory classification of capital assets, §§ 1221 and 1231, and that it was in fact used in the trade and business of the taxpayer, even though the activity was subsequently discontinued. As stated in Mercado v. United States, 215 F.Supp. 631 (D.C. N.Y.1963) at page 632:

"Generally, gains from the sale of depreciable real property used in the trade or business of a taxpayer are taxable at capital gain rates to the extent that such gains exceed losses from the sale of the depreciable property. However, if the losses on the sales of depreciable real property used in the taxpayer's trade or business exceed the gains from sales of such property in any year, the losses are ordinary losses and are deductible against ordinary income."

*Mercado* was decided under 117(a) of the 1939 Code, which became § 1221 of the 1954 Code, governing the same point.

■ The change in the taxpayer's business activity from that of a woodworking business to which the property here in question had been devoted but which business was ·discontinued because unprofitable, and the assumption of a new activity, that of the management-consulting business, did not convert such non-capital assets into capital assets with capital loss treatment. Inasmuch as the property had been acquired for use in trade or business, it did not lose its non-capital character as such merely because it ceased to be actively used in the business. Solomon Wright, Jr. v. C. I. R., 9 T.C. 178; Graves Bros. Co. v. C. I. R., 17 T.C. 1499; Alfred Kruse v. C. I. R., 29 T.C. 463. Nor does the fact that the property was held for valid economic reasons, such as leasing or selling in a favorable market in an effort to minimize losses, effect a conversion of tax loss classification and treatment. Clark v. United States, 200 F.Supp. 668 (D.C.Tenn.1961). The taxpayer was not in the real estate or machinery sales business.

■ Inasmuch as the claimed losses span years involving an intervening change in law under the Internal Revenue Code, some mention must be made regarding computations as well as adjustments by way of carryovers. While the critical event, the 1957 absorption of the partnership's assets, is controlled by the law under the 1954 Code, *Maxwell Hardware*, supra, the losses span both 1939 Code years and 1954 Code years. So that the law in effect at the time that the loss is incurred determines the computation formulae applicable; however, the law in effect at the time that the carryback or carryover is sought to be effected determines the formulae for adjusting such carrybacks or carryovers. 26 U.S.C. § 172(e); 83rd Cong., S.Rep. No.1622 (1954) 211; Reg. § 1.172–1(e); Fawick Corp. v. Commissioner of Internal Revenue, 342 F.2d 823 (6 Cir. 1965); American Bank & Trust Co. v. United States, 333 F.2d 416 (5 Cir. 1964); Rankin & Johnson, supra, § 4.09(3) p. 461 (1965).

■■ In conclusion, a careful review of the many cases in the area of law pertaining to net operating loss carryovers as well as a consideration of administrative interpretative bulletins have circumscribed the several issues in this case, but direct authoritative treatment of the law of corporate net operating loss carryovers in the particular shifting circumstances here involved, is lacking. As previously stated, the Supreme Court in *Libson Shops*, supra, did not reach the precise issue presented here, as we see it, reserving that problem in its now famous marginal reference number 9 for another time. The Court of Appeals for this Court, as well, reserved decision in *Frank IX & Sons Virginia Corporation*, supra, on the impact of §§ 381 and 382 of the 1954 Code on the *Libson Shops*

doctrine. Judge Freedman, writing for the Court in *Frank IX & Sons Virginia Corporation* and speaking of corporate reorganizations, isolated the ignition point for disallowance, stating:

> " * * * [T]he carryover provision was designed only to aid the single business which had gone through a period of fluctuating income, and not to give an added advantage to the common owners of separate corporations."

But, in this case, we are not confronted with affinity of separate corporate entities. Rather, we have a hybrid, i. e., common owners absorbing their own partnership business into their own corporation. And the philosophy behind the carryover legislation is designed to benefit only those persons suffering the losses who also developed the income against which those losses are sought to be offset. Norden-Ketay Corp. v. C. I. R., 319 F.2d 902, 905 (2 Cir. 1963) cert. den. 375 U.S. 953, 84 S.Ct. 444, 11 L.Ed.2d 313 (1963). Such was the tax situation here, as the same owners wore the same pockets for taxable income and losses. This is economic reality not a mere exercise in legal semantics; for despite the corporate mutations over the years, the individual owners remained unchanged.[20]

While such a distinguished jurist as Judge Friendly of the Second Circuit may have been persuaded, but not without some hesitation, that the facts in Julius Garfinckel & Co. v. C. I. R., 335 F.2d 744, 749 (2 Cir. 1964) cert. den. 379 U.S. 962, 85 S.Ct. 651, 13 L.Ed.2d 556 (1965), 9 A.L.R.2d 330, came within the *Libson Shops* doctrine despite substantial identity of ownership, that Court was not confronted, as here, with the 1954 Code. Under the 1954 Code, this Court is inclined in quite another direction. Ultimate resolution, as was indicated by Judge Friendly, lies, of course, in ultimate review.

Nevertheless, if Congress desires to limit the carryover privilege, so that *either* substantial change in owner-ship attributable to acquisition of stock control *or* substantial change in trade or business destroys the privilege, then, as is its prerogative, it may and should so state legislatively by using the disjunctive alternatives rather than the conjunctive component elements as it did in § 382 of the 1954 Code. In reading the statute, the words used indicate to this Court, at least, that the loss carryover privilege is not foreclosed under the particular circumstances of the present case. As Mr. Justice Holmes once warily observed, the intention of Congress and the spirit of its legislation are to be gleaned from the precise words which it uses, not from what it may have intended to use. And, as was stated so aptly in *Maxwell*, supra, 343 F.2d at page 721:

> "Sometimes plain statutory language is distorted by courts to achieve what appears to be a just result in a particular case. The Government seeks to have this Court do that with respect to Sections 172, 382 and 269 to attain what it deems to be the just result in this case."

And further, at page 723:

> "Taxation is peculiarly a matter of statutory law, and in applying that law to the determination and computation of income and deductions, the Courts do not make moral judgments. There is nothing perfidious or invidious in enjoying a statutory deduction from reportable income. It is not a matter of conscience but of statute and the determination of Congressional intent. In our opinion, Congress has quite plainly said that net operating loss deductions should be allowed unless the special circumstances interpreted within the letter and spirit of Sections 382 (a) and 269 obtain. * * * It is of much more importance that businessmen, accountants, lawyers and revenue agents should retain confidence that plain statutory language means what it says and what it reasonably implies than that a particular deficiency assessment should be sustained."

---

20. The losses were those of Warsaw Products, Inc., owned by the partners.

The human beings behind the corporate facade of the plaintiff corporation are the same individuals who sustained both the losses and earned the taxable income; it is they who must bear the burden of taxation and who also should be entitled to invoke the statutory privilege of offsetting net operating losses not otherwise interdicted by the letter or spirit of the statute in these particular circumstances; and it is they who seek to reduce, not evade, the amount of taxable income which is properly chargeable under the Internal Revenue Code.

For the above reasons, judgment shall be entered in favor of the plaintiff.

Counsel for plaintiff shall submit an appropriate order in conformity herewith.