In re UNIVERSAL MONEY
ORDER CO., Debtor.

Carl J. SCHMITT, Appellant-Respondent,

v.

Eliot LUMBARD, Receiver,
Appellee-Applicant.

No. 77 B 73.

United States District Court,
S. D. New York.

Sept. 7, 1977.

Levin & Weintraub, New York City, for appellant-respondent; Michael J. Crames, Daniel A. Zimmerman, New York City, of counsel.

Cleary, Gottlieb, Steen & Hamilton, New York City, for appellee-applicant; George Weisz, M. Karlynn Hinman, New York City, of counsel.

Krause, Hirsch & Gross, New York City, for debtor.

HAIGHT, District Judge:

Carl F. Schmitt, Superintendent of Banks of the State of California (the "Superintendent") appeals from three orders of the Hon. John J. Galgay, Bankruptcy Judge, which in effect directed the Superintendent to turn over to Eliot Lumbard, the Receiver of debtor-in-possession Universal Money Order Co. ("UMO") assets of UMO which the Superintendent had seized in California. The Receiver and UMO resist the Superintendent's appeal, which is before the Court pursuant to Bankruptcy Rules 801 *et seq.* For the reasons stated, the orders appealed from are affirmed.

I.

The facts as found by the Bankruptcy Judge are set forth in his opinion of May 3, 1977, at pp. 1–4, and are not challenged in any significant respect on this appeal. The decisive issues turn upon legal interpretations and consequences.

Briefly stated, UMO was in the business, *inter alia*, of selling money orders. Companies such as UMO provide services to persons who cannot establish regular banking services. Typically, a UMO customer pays in cash and receives a money order payable to one of his creditors, such as a utility company or landlord. UMO conducted such business directly, and also through agents and subagents with which it had contracts. Much of UMO's business was done in California.[1] The proceeds of California money order sales were deposited in bank accounts in California maintained in UMO's name. Those accounts also received, from time to time, the proceeds of UMO's other activities (check cashing, sale of food stamps), as well as transfers of funds (required for operational purposes) from UMO accounts in other states.

UMO encountered financial difficulties. It stopped honoring its money orders on

---

1. According to the Receiver's Fifth 30 Days' Report, Appendix C to the Superintendent's reply memorandum, as of July 8, 1977 there were 303,771 defaulted UMO money orders, with a total dollar amount of $13,354,217.98.

199,736 of those checks, with a total value of $9,346,069.83, were purchased in California, with the balance distributed among six other states and additional federal credit unions.

January 6, 1977. However, UMO continued selling money orders subsequent to that date. This situation came to the Superintendent's attention on January 10, when it was reported to him that "money orders were being returned by the paying agent in Connecticut." [2]

UMO had been licensed to sell money orders in California in 1971, pursuant to Chapter 14, Article 3 of the Banking Law of California (Division One of the Financial Code [hereinafter "Cal.Bk. Law"]), §§ 1800 *et seq.* The Bankruptcy Judge found that UMO's license had lapsed on or about July 1, 1976; that a renewal application was subsequently made (but apparently not acted upon); and that, subsequent to July 1, 1976, UMO continued to do business in California without a license then in effect, and with the knowledge of the Superintendent. On January 10, 1977, the Superintendent issued a license to UMO, mailing it to an old New York address for the company, from whence it was returned by the postal authorities to the Superintendent. The Bankruptcy Judge, for the purposes of his opinion, regarded UMO as being at all pertinent times a duly authorized licensee in California; and so does this Court for purposes of the appeal, although the inference appears inescapable that the Superintendent issued UMO its renewed license on January 10, 1977 for the sole purpose of arming himself to take the actions to which we now turn.

On January 12, 1977, the Superintendent, at his offices in San Francisco, prepared a document entitled "Order Taking Possession of Property and Business". That Order recited the Superintendent's findings of fact that UMO was licensed by the Superintendent under the Cal.Bk. Law; and that money orders issued and sold by UMO in California were being dishonored. As "Ultimate Findings", the Superintendent found that UMO had violated California law and was in such condition that it was unsound, unsafe and inexpedient for it to transact business. In these circumstances, the Superintendent purported to "take possession of the property and business" of UMO. Immediately above the Superintendent's signature and his seal of office on this order, there appears the notation:

"Date and Hour: January 12, 1977, at 9:45 a. m."

It is apparently not disputed that the Superintendent affixed that date and time himself, while sitting in his office. 9:45 a. m. Pacific Standard Time is, of course, the equivalent of 12:45 p. m. Eastern Standard Time.

On January 12, 1977, at 12:57 p. m. Eastern Standard Time, or 12 minutes after the Superintendent signed his order in California, UMO by its attorneys filed in this Court a petition pursuant to Chapter XI of the Bankruptcy Act and Rules, 11 U.S.C. §§ 1 *et seq.*

What happened after the Superintendent signed his order is described in a letter dated March 16, 1977 from Messrs. Levin & Weintraub, counsel for the Superintendent, to Messrs. Cleary, Gottlieb, counsel for the Receiver:

"Immediately after the signing of the Order, James Carrig, Esq., counsel to the Superintendent telephoned the State Banking Department's Los Angeles office and requested that that office immediately notify an officer of UMO at the Culver City office of the Order. Mr. Bernard Rolnick, Vice President of Universal was notified on or about 9:50 A.M. P.S.T. by Mr. Allan A. Farias the Bank Examiner at Universal's Culver City office of the Order Taking Possession and further advised that a copy of the Order would be delivered later in the day. In fact, at 10:30 A.M. P.S.T., copy of the Order with the transmittal letter was delivered to Mr. Rolnick.

"Between 10:15 A.M. and 11:30 A.M. P.S.T. on January 12, 1977, Bank Examiners telephoned Bank of America, Bank of Finance, Imperial Bank, Security Pacific National Bank and Western Bank of

---

2. Testimony of Carl J. Schmitt before the Bankruptcy Judge, February 1, 1977, at p. 18. All UMO money orders, wherever sold, were presented for payment to the Colonial Bank in Hartford, Conn.

Commerce, and read to them a Notice of Taking Possession which recited the facts set forth in the Order. All other banks involved were notified on the following day January 13, 1977." [3]

Thereafter, as the Bankruptcy Judge found, the Superintendent issued a written "Notice of Taking Possession and Order Regarding Deposits" which was addressed to "All Banks Holding or Having in Their Possession Any Deposits or Other Assets of Universal Money Order Co."

As a result of these actions, the Superintendent succeeded in seizing in excess of $5,500,000 in UMO assets on deposit in California banks. The Superintendent proposes to distribute these assets to purchasers of money orders from UMO resident in California, such distribution to be governed by California law.

The proceedings below were instituted by the debtor-in-possession, and carried forward by the Receiver subsequent to his appointment. The Receiver takes the position that the assets seized by the Superintendent in California must be processed as part of the estate of the debtor-in-possession within the context of the federal Chapter XI proceeding.

The Bankruptcy Judge, ruling in favor of the Receiver, held that federal bankruptcy law extinguished and superseded any right or power of the Superintendent to seize UMO's assets or to distribute them in California; that the bankruptcy court had summary jurisdiction to require the Superintendent to turn over the assets to the Receiver; and that the bankruptcy court had personal jurisdiction over the Superintendent. The effects of the Bankruptcy Judge's orders of April 11, May 3 and May 9, 1977 were to direct the Superintendent to deliver to the Receiver appointed by the bankruptcy court all assets of UMO seized by the Superintendent; and to direct the Superintendent to file an accounting with respect

to his administration of such assets. The Superintendent, having complied with these orders of the Bankruptcy Judge, now prosecutes this appeal.

## II.

The Bankruptcy Judge held, in effect, that the supremacy of the national bankruptcy law placed an unsurmountable obstacle in the path the Superintendent sought to follow for the benefit of California creditors alone. Before turning to the Superintendent's several attempted justifications of his actions, we consider the nature of that national law which the Bankruptcy Judge found to be decisive.

■ The concept of a uniform, national bankruptcy law derives from the Constitution, Article I, Section 8, Clause 4 of which provides:

"The Congress shall have Power . . . To establish . . . uniform Laws on the subject of Bankruptcies throughout the United States."

The passage by Congress of the Bankruptcy Act and its several amendments, including the provisions for Chapter XI arrangements with which we are primarily concerned, constitutes an exercise of that power.

It is well settled that where a state statute conflicts with a mandate of the Bankruptcy Act, it is invalid under the Supremacy Clause of the Constitution. *Perez v. Campbell*, 402 U.S. 637, 91 S.Ct. 1704, 29 L.Ed.2d 233 (1970).

■ "The original and primary purpose of bankruptcy legislation has been, and continues to be, a fair and equitable distribution of the nonexempt property of a bankrupt person to and among his creditors." 4 *Collier on Bankruptcy* ¶ 67.01 at p. 15 (14th ed. 1976). It is an essential implementation of that purpose that the several states, by means of their own laws, cannot devise

---

**3.** This letter appears as Ex. F to the affidavit of Receiver's counsel below. Counsel for the Superintendent drafted the letter in aid of a proposed stipulation of facts which was never executed. However, in view of the fact that the Bankruptcy Judge rendered the equivalent of summary judgment against the Superintendent, these assertions may be deemed true for the purpose of this appeal, which views the evidence in the light most favorable to the appellant.

preferences among creditors of a federal bankrupt which the federal law does not recognize. Thus in *Elliott v. Bumb*, 356 F.2d 749, 754–755 (9th Cir. 1966), upon which all parties in the present case rely, the Ninth Circuit reviewed turn-of-the-century case law and then observed:

"Since the time of that decision, Congress has made even clearer its intent that state law shall not be permitted to confer preference on one class of the creditors of one adjudged a bankrupt under federal law, even though the state may have the highest public purpose in attempting to do so."

■ In order that uniform and equitable distribution among all similarly situated creditors be accomplished, Congress has vested the bankruptcy courts with broad powers of possession, recapture and control of a debtor's property. Thus Section 311 of the Act, 11 U.S.C. § 711, which deals (as does the case at bar) with arrangements, provides that where not inconsistent with other provisions of Chapter XI, the court in which the debtor's petition is filed has "exclusive jurisdiction of the debtor and his property, wherever located." Section 311, which confers upon the Chapter XI court "greater jurisdiction than is possessed by the court in an ordinary bankruptcy case under Chapters I to VII," *Collier, op. cit.,* Vol. 8, ¶ 3.01, p. 147, rests that jurisdiction upon ownership of property, as distinguished from possession. Where, as in the case at bar, a third party in possession claims ownership of the property, it is well settled that:

". . . the bankruptcy court has jurisdiction in the first instance to determine if the adverse claim of ownership is substantial or colorable; if found to be substantial the court must decline to determine the merits and must dismiss the summary proceeding, but if found to be merely colorable the court has jurisdiction to adjudicate the merits summarily." *Collier, op. cit.,* Vol. 8, ¶ 3.02, pp. 162–163.

In the instant case Judge Galgay, concluding that the Superintendent's claims were only colorable and not substantial, proceeded to a summary adjudication.

The statutory policy of a uniform and national distribution of a debtor's assets among its creditors is further implemented by provisions empowering the bankruptcy courts to:

"Require receivers or trustees appointed in proceedings not under this Act . . . to deliver the property in their possession or under their control to the receiver . . . appointed under this Act . . ." Bankruptcy Act § 2a(21), 11 U.S.C. § 11.

Also, secret or "equitable" liens are invalidated by the Bankruptcy Act, 11 U.S.C. § 96, as are all state-created priorities except for rent, 11 U.S.C. § 104(a)(5), and statutory liens not accompanied by "possession of" or by "levy upon" the property subject to lien before the filing of the petition in bankruptcy, 11 U.S.C. § 107(c)(2).

■ Thus the Superintendent, seeking to distribute substantial assets of a debtor in bankruptcy for the benefit of only one group of creditors (California money order purchasers), without regard to the like claims of others (purchasers from other states), faces a considerable burden of persuasion. We turn to his contentions.

### III.

Challenging the bankruptcy court's powers at the threshold, the Superintendent contends that UMO's accounts in the California banks were not owned by UMO at the time the Chapter XI petition was filed, namely, on January 12, 1977, at 12:57 p. m. E.S.T. (or 9:57 a. m. P.S.T.).

To establish that proposition, the Superintendent must of necessity demonstrate that his own seizure order of January 12, which he endorsed as issued at 9:45 a. m. P.S.T. (12:45 p. m. E.S.T.), was self-executing. That is to say, it is essential to the Superintendent's argument that the issuance of this order in the Superintendent's office, *ipso facto* and *without notification to the California banks* holding UMO's money, brought about such a change in status that the deposits no longer belonged to UMO, and the banks could no longer treat them as if they did.

The Bankruptcy Judge concluded that the order was not self-executing, and that seizure was not effectuated until notice had been received by the banks. That, of course, was not accomplished until later in the day on January 12, after the Chapter XI petition had been filed in New York. We agree. If the judge's conclusion be viewed as a finding of fact, it cannot be characterized as clearly erroneous, Bankruptcy Rule 810; if a conclusion of law, it is supported by the statute pursuant to which the Superintendent acted, and the manner in which he in fact acted.

The California Banking Law, pursuant to whose provisions UMO was licensed in that state, and the Superintendent purported to act, authorizes the Superintendent, upon the finding of certain grounds, to "forthwith take possession of the property and business of such licensee . . ." Cal.Bk. Law § 1825. The use of the word "forthwith" does not mean that the Superintendent's initial order is self-executing as to all those interests that may eventually be effected by it; within the overall statutory scheme, it simply permits the Superintendent to commence possession on the basis of his own *ex parte* findings and conclusions, leaving it to the licensee to test the merits by applying to the courts. Cal.Bk. Law § 1822. The manner in which a seizure is *effectuated* (the more significant consideration here) is spelled out by Cal.Bk. Law § 1825:

"When the superintendent takes possession of the property or business of any licensee for the purpose of liquidation or conservation, he shall liquidate or conserve the property or business pursuant to Chapter 17 of this division."

And Chapter 17, § 3103, incorporated by reference in § 1825, provides:

"Upon taking possession of the property and business of any bank, the superintendent shall forthwith give notice of such fact to all persons holding or having in their possession any assets of such bank. No person *knowing of such taking or who has been notified thereof* shall have a lien or charge upon any assets of the bank for any payment, advance, or clearance *thereafter made* or for any liability *thereafter incurred.*"

In the case at bar, the Superintendent argues (reply memorandum, p. 5) that "the first sentence of Section 3103 clearly infers that the Superintendent has possession prior to his giving notice of such fact to those persons holding or having possession of the assets of the licensee." We reach precisely the opposite conclusion from the reading of Section 3103. The second sentence of that section makes it quite clear that, until notice of the taking of possession has actually been received by those persons or entities holding assets of the licensee proceeded against, such persons or entities are at liberty to continue treating the assets as being the property of the licensee, just as in the past.

That conclusion is reenforced by the wording of the actual notice sent by the Superintendent to the banks in question, later in the day on January 12. A copy of that notice is in the record before the Bankruptcy Judge; it reads in part:

"Under the provisions of California Financial Code Sections 1825 and 3103, no person who knows of such taking or who has been notified of such taking shall have a lien or charge upon any assets of Universal for any payment, advance, or clearance thereafter made or for any liability thereafter incurred.

"You are hereby ordered not to cause or permit any withdrawal to be made from any deposit of Universal, not to pay any checks drawn on any deposit of Universal, and not to make any transfer or other disposition of any deposit or other asset of Universal without prior written authorization of the Superintendent of Banks."

Under the pertinent California statutes, as paraphrased by the Superintendent in his notices to the banks, there is no basis upon which the banks holding UMO assets could have been criticized or surcharged for transferring or releasing assets to UMO prior to receipt of the notification. Significantly, the Superintendent's instructions to the banks, as contained in

the second of the two above-quoted paragraphs, begins with the phrase: "You are *hereby* ordered . . ." Manifestly, until they received that notification and order (which, viewing the facts in the most favorable light to the Superintendent, did not occur until after filing of the Chapter XI petition), the banks were under no arguable restraint in respect of the UMO deposits. The Bankruptcy Judge's conclusion that the Superintendent's initial order was not self-executing, at least in the sense of possession and control of the bank deposits, was clearly correct.[4]

■ That being so, then as the Bankruptcy Judge correctly concluded, monies held by banks for UMO and in the name of UMO were in the constructive possession of UMO, *Taubel-Scott-Kitzmiller Co. v. Fox*, 264 U.S. 426, 433, 44 S.Ct. 396, 68 L.Ed. 770 (1924), at the time the Chapter XI petition was filed at 12:57 p. m. E.S.T. The debtor's entire estate came within the control of the bankruptcy court from the filing of the petition, *Straton v. New*, 283 U.S. 318, 321, 51 S.Ct. 465, 75 L.Ed. 1060 (1931), the filing of the petition having the legal effect of "a *caveat* to all the world." *Mueller v. Nugent*, 184 U.S. 1, 14, 22 S.Ct. 269, 275, 46 L.Ed. 405 (1902). While the Superintendent in his reply memorandum (pp. 5–7 argued that certain provisions in Section 70d of the Bankruptcy Act, 11 U.S.C. § 110d, operate by analogy to vest constructive possession in the Superintendent at the time of his original order, the Bankruptcy Act provisions address quite different issues, and the analogy is unpersuasive.

### IV.

■ As an alternative basis for decision, the Bankruptcy Judge held that even if the Superintendent had possession of the deposits at the time the bankruptcy petition was filed, the bankruptcy court nevertheless had summary jurisdiction, by virtue of the debtor's ownership of the deposits. We agree with this holding as well.

■ The distinction is important because, as noted *supra*, the decisive element under Section 311 is ownership, not possession. The Bankruptcy Act specifically provides for recapture by the bankruptcy court of assets which, while owned by the debtor at the time of bankruptcy, have found themselves in the possession of a third party.

The Superintendent as such a third party, contends that, at the time of the filing of the Chapter XI petition, UMO had neither possession nor ownership of its deposits in the California banks. The Superintendent's contentions with respect to possession have been dealt with in the proceedings section of this opinion. We are now concerned with ownership.

The Superintendent contends, in effect, that UMO's deposits in the California banks were impressed with a trust for the benefit of California purchasers of money orders, which the Superintendent, by virtue of his office, is entitled to enforce. The Superintendent suggests three alternative bases for the existence of such a trust: (1) an express trust, arising out of UMO's manifestations of intent; (2) a statutory trust, arising out of certain provisions of California law; and (3) a constructive trust, arising out of actions on UMO's part which the Superintendent characterizes as fraudulent.

It has been stated generally that:
". . . where the bankrupt or debtor was in the possession of property impressed with a trust which is valid under the terms of the [Bankruptcy] Act, the bankruptcy or reorganization trustee generally holds such property subject to the outstanding interest of the beneficiaries . . . Clearly, the burden rests upon the claimant [of the trust] to establish the

---

4. We do not overlook the assertion of Superintendent's counsel, taken as true on the appeal (n. 3 *supra* ), that "on or about 9:50 A.M. PST" a bank examiner advised a UMO officer by telephone of the seizure order. Such a telephone call, made at 12:50 P.M. EST, would have preceded the Chapter XI filing by seven minutes. But this call is insufficient to create possession in the Superintendent within the context of a statutory scheme which clearly contemplates notices and implementing orders to those holding the assets of the licensee being proceeded against.

original trust relationship. He must prove his title and identify the trust fund or property; where the fund or property has been mingled with the general property of the debtor, the claimant must sufficiently trace the property. However, if it cannot first be shown that a trust has been created, there is no necessity for inquiry as to whether the property can be identified or traced." 4A *Collier on Bankruptcy* (14th ed. 1976) at ¶ 70.25, pp. 340–343.

We now turn to the several methods by which the Superintendent attempts to carry this burden.

*The Express Trust Theory*

The Superintendent argues that, in documents which it executed for the purpose of doing business in California, UMO manifested its intent to impress deposits standing to its name in California banks with a trust in favor of the purchasers of money orders. Success on this theory depends, of course, "on a finding of actual intention of the parties to establish a trust." *Collier, op. cit.*, at ¶ 70.25(1), p. 344. In the case at bar, the Superintendent relies upon an agreement which UMO was obliged to enter into with the Superintendent of Banks, in connection with obtaining its license under Cal.Bk. Law § 1800 *et seq.*

■■■ Paragraph 5 of that agreement provides, *inter alia*, that UMO "shall segregate California transmission funds and keep such funds separate and apart from other funds and assets under its control"; the agreement further provides that:

"California transmission funds shall be security for the transmission of such funds in accordance with instructions given by those from whom such funds were received until such time as the transmission of such funds is completed."

The Superintendent, conceding that this agreement does not use the word "trust", argues nonetheless that it indicates "an in-

tention on the part of UMO to treat California transmission funds as trust funds." (Main Brief, p. 15). While we recognize the general rule that a trust may be found in the absence of the use of that particular word, it hardly follows that a trust will be found in the presence of different words which the parties use to define the relationship. In the present case, the operative word is "security", not "trust". The Superintendent cites no authority holding that, in this particular context, the words should be treated as synonymous. And it is significant that the Bankruptcy Act, while recognizing certain trusts, invalidates secret security liens unless they are accompanied by solemnities not present in the case at bar. Section 60a(6), 11 U.S.C. § 96.

■■■ The Superintendent also purports to find support in the standard form of "Agency and Trust Agreement" which UMO entered into with its agents. That agreement provides, in effect, that any monies received by agents in the sale of UMO money orders become impressed with a trust *in favor of UMO*. The Superintendent accurately states (Main Brief, p. 17) that "this provision is a device to protect the interest of UMO in case of the bankruptcy of an agent." The Superintendent then goes on to state: "This provision is not inconsistent with the proposition that the proceeds from sales of money orders constitute trust funds for the benefit of purchasers of money orders." That may be so, but the provision in UMO's agreement with its own agents hardly *supports* that proposition. The Superintendent's concluding assertion, that "UMO, as beneficiary of the trust held by the agent, was simply acting in its capacity as trustee of the trust for the benefit of the purchasers", is fairly characterized as "bootstrapping" by the Receiver, although the Court—with due respect to the Superintendent and his counsel—is more forcibly reminded of a recently deceased California resident's famous routine.[5] The Superintendent has failed to

5. GROUCHO MARX (cast in the role of a detective): "It is my belief the missing painting is hidden in the house next door."
CHICO (looking out window): "There is no house next door."

GROUCHO: "Then we'll build one."
So may the wish be father of the thought.

demonstrate an express trust in favor of California purchasers, manifested by declarations of UMO, and the Bankruptcy Judge was correct in so concluding.

### Statutory Trust

The Superintendent contends, in the alternative, that the California banking law, under which UMO was licensed in that state, creates a trust in favor of California purchasers of money orders.

It has been stated generally:

"Statutory enactments may operate to create trusts in favor of designated persons. Recognition of such trusts, together with their incidents, has generally been regarded by the bankruptcy courts as a matter of following and applying the local law." Collier, op. cit., Vol. 4A, ¶ 70.-25(1), p. 348.1.

While this statement accurately reflects the trend of earlier cases, the same commentator suggests that, in the light of more recent amendments to the Bankruptcy Act, a statutory trust should be given no more favorable treatment in bankruptcy than statutory liens.[6]

The Bankruptcy Judge was not required to consider that broader proposition because he concluded that the California banking law upon which the Superintendent relies does not even purport to create that trust relationship which underlies the Superintendent's theory of ownership. We agree with that conclusion. The only section in the pertinent statute using trust language is expressly limited to funds received by a licensee or its agents "for trans-

mission to a foreign country . . ."[7] The Superintendent argues at length that this "trust section" should be read so as to cover all funds received for transmission, either to foreign countries or in domestic commerce. Such an interpretation, the Superintendent argues, would effectuate the California legislature's intentions in respect of 1963 amendments to the financial statutes; the Superintendent contends, in sum, that the legislature meant to impress all funds received with a trust, but inadvertently failed to say so. The Bankruptcy Judge was unpersuaded by that argument, and so are we, particularly since it is apparent from the 1963 amendments that the California legislature understood the difference between foreign and domestic transmissions, giving such transmissions different treatments in different statutes. The Superintendent cites cases for the proposition that statutes must be given a reasonable and common sense construction in order to implement the intention of the lawmakers; but to sustain the Superintendent's present contention, it would be necessary to go behind the express terms of the statute and, in effect, to disregard them. That is not a proper function of a court. United States v. Miller, 367 F.2d 72, 76 (2d Cir. 1966), cert. den., 386 U.S. 911, 87 S.Ct. 855, 17 L.Ed.2d 787, rehearing den., 392 U.S. 917, 88 S.Ct. 2049, 20 L.Ed.2d 1378. In WOFAC Corp. v. United States, 269 F.Supp. 654, 670 (D.N.J.1967), the district court recalled Mr. Justice Holmes' observation that "the intention of Congress and the spirit of its legislation are to be gleaned from the precise words which it uses, not from what it may have intended to use."

---

6. 4 Collier on Bankruptcy ¶ 67.25(2) at p. 351 (14th ed. 1975) states:

".  .  . the statutory trust is no more than a legislative device to protect a particular class of creditors. In view of the elimination of all state-created priorities but one in § 64a(5) and the avowed purpose in § 67c to implement the policy of § 64a by striking at statutory liens indistinguishable from priorities, there is reason for treating the statutory trust in the same way as is functional equivalent, the statutory lien, so far as bankruptcy is concerned."

The commentators find support for this view in the Second Circuit's opinion in Wickes Boiler

Co. v. Godfrey-Keeler Co., Inc., 121 F.2d 415 (2d Cir. 1941), modifying on rehearing, 116 F.2d 842 (2d Cir. 1940).

7. Cal.Bk. Law § 1816 provides:

"All funds, less fees, received by a licensee or its agents for transmission to a foreign country shall constitute trust funds owned by and belonging to the person from whom they were received until such time as directions have been given by the licensee or its agents for payment abroad of the remittance and funds provided for such payment."

There remains, of course, the trust theory that arises in respect of funds received "for transmission to a foreign country", as referred to in Cal.Bk. Law § 1816 (quoted at n. 7 *supra*). The Superintendent suggests (Main Brief, p. 23) "that every sale of a money order constitutes, at least potentially, the receiving of money for transmission to a foreign country"; but it is quite clear from the testimony of the Superintendent himself before the Bankruptcy Judge that most of the money orders in question were for the purpose of paying domestic creditors of the purchasers.[8] In subsequent proceedings before the bankruptcy court, it may be necessary for that court to determine the extent to which, if any, valid and binding trusts exist in respect of funds received by UMO for transmission to foreign countries. As to that, this Court intimates no present view. It is sufficient to state, for the purposes of the present appeal, that the California statute upon which the Superintendent relies does not establish a trust over the assets seized by the Superintendent.

### Constructive Trust

■ The Superintendent's third trust theory, apparently not raised before the Bankruptcy Judge, is based upon § 224 of the California civil code, which characterizes as "an involuntary trustee" anyone who gains a thing by fraudulent means.[9] After a further review of California authorities on the subject of fraud, the Superintendent argues that, in continuing to sell money orders after it had ceased honoring them,

UMO must be regarded as having committed fraudulent acts, so that it became an involuntary or constructive trustee, at least to the extent of proceeds from sales of money orders received after it had become insolvent and had ceased honoring money orders previously sold.

The Superintendent cites no authority for the proposition that a state-created, constructive trust theory rooted in tort principles of fraud should take precedence over federal bankruptcy laws in the distribution of a debtor's property. The destructive effect of such a concept, within the context of a uniform national bankruptcy law, is apparent. It must surely be a common occurrence that a debtor, collapsing into insolvency but not yet the subject of a formal bankruptcy proceeding, continues to do business with a wide variety of creditors. It is perfectly in order for the states to pass laws which, in the absence of federal bankruptcy proceedings, cast such a debtor in the role of involuntary or constructive trustee, for the benefit of those with whom he does business in those circumstances. But to exalt such state laws over the federal bankruptcy law, once bankruptcy has intervened, would be destructive of those underlying bankruptcy principles and purposes which have been referred to *supra,* and are not here reiterated. There is no merit in this alternative trust theory.

### V.

■ As a final theory, the Superintendent relies upon the agreement UMO exe-

---

8. The Superintendent, describing his office's administrative efforts after the seizure, testified:

"In order to deal with the public side of it, we have had a task force headed by my chief deputy who has been in contact with utility companies, major retailers and basically what we determined to be major recipients of money orders in the states.

"We took a sampling of money orders coming through clearings, through Security Pacific of approximately 850.

"We ran that sampling down, categorized it and determined where the money orders were, in essence, logged, if you will.

"We found upwards of thirty percent were with utilities.

"We have been, working with the utilities as well as these other companies, small loan companies, insurance companies, again, asking that they all consider a policy of holding and waiting to see what could be worked out in the way of a speedy payment mechanism of some sort." February 1, 1977 hearing at pp. 25-26.

9. § 2224 provides in its entirety:

"One who gains a thing by fraud, accident, mistake, undue influence, the violation of a trust, or other wrongful act, is, unless he has some other and better right thereto, an involuntary trustee of the thing gained, for the benefit of the person who would otherwise have had it."

cuted with his office as a condition of doing business in California, which, as we have noted *supra*, provided in part that "California transmission funds shall be security for the transmission of such funds in accordance with instructions given by those from whom such funds were received . . ."

The Receiver characterizes this security interest, stemming from a private agreement and not a publicly filed document, as a secret or equitable lien, of the sort disfavored by bankruptcy law.[10] The Superintendent, relying upon certain provisions of the California Commercial Code,[11] contends that perfected security interests exist which require reversal of the Bankruptcy Judge's orders. Specifically, the Superintendent seeks to bring himself within one of two exceptions to the general California statutory requirement that "[a] financi[al] statement must be filed to perfect all security interests." Com.Code § 9302(1). The first claimed exception is "[a] security interest in collateral in possession of the secured party under Section 9305." § 9302(1)(a). The Superintendent argues that his original seizure order endowed him with that sort of "possession" contemplated by § 9302, so as to give rise to a perfected security interest.

The argument does not withstand analysis. First, it assumes that the "transmission funds" UMO receives from money order purchasers constitute "collateral" within the meaning of the Commercial Code. That is a doubtful proposition; no authority is cited for it. Second, the Commercial Code requires that the "collateral" be in the possession of "the secured party", in this case the purchasers of the money orders. The Superintendent equates himself with those parties, again a doubtful proposition, again without citation of authority.[12] Third, it has already been determined, within the trust theory context, that the Superintendent's seizure order did not vest him with possession. That is no less true in the perfected security context, particularly since Com.Code § 9305, to which § 9302(1)(a) refers, conditions possession upon *notification* of the bailee holding the collateral.[13]

The second claimed exception appears in Com.Code § 9302(1)(h), which refers to "[a] security interest in a deposit account." Where the "deposit account" is not "maintained with the secured party", the security interest is perfected "when notice thereof is given in writing to the organization with whom the deposit account is maintained." The Superintendent professes his ability to prove, on a trial, "written notice to the various banks in possession of the transmis-

---

10. Section 60a(6), 11 U.S.C. § 96(a)(6), provides in part:

"The recognition of equitable liens where available means of perfecting legal liens have not been employed is declared to be contrary to the policy of this section. If a transfer is for security and if (A) applicable law requires a signed and delivered writing, or a delivery of possession, or a filing or recording, or other like overt action as a condition to its full validity against third persons other than a buyer in the ordinary course of trade claiming through or under the transferor and (B) such overt action has not been taken, and (C) such transfer results in the acquisition of only an equitable lien, then such transfer is not perfected within the meaning of paragraph (2) of this subdivision."

11. § 9302 of the Code provides in part:

"(1) A financing statement must be filed to perfect all security interests except the following:
"(a) A security interest in collateral in possession of the secured party under Section 9305;

* * * * * *

"(h) A security interest in a deposit account. Such a security interest is perfected:
"(1) As to a deposit account maintained with the secured party when the security agreement is executed;
"(2) As to a deposit account not described in subparagraph (1) when notice thereof is given in writing to the organization with whom the deposit account is maintained."

12. This is a factor which is also discussed *infra* in our consideration of the bankruptcy court's summary jurisdiction, and the existence *vel non* of a substantial *adverse* claim on behalf of the Superintendent against the bankrupt estate.

13. § 9305 provides in pertinent part:

"If such collateral other than goods covered by a negotiable document is held by a bailee, the secured party is deemed to have possession from the time the bailee receives notification of the secured party's interest."

sion funds." But the Superintendent has not demonstrated—as was his burden [14]—that the declarations in UMO's letter agreement with the State Banking Department, that California transmission funds shall be segregated by UMO and "shall be security", are the legal equivalent of a "deposit account" as that phrase is used in Com.Code § 9302(1)(h). Certainly no authority is cited for that proposition, and it appears as doubtful others commented upon *supra.* There also exists the doubtful standing of the Superintendent, as opposed to the purchasers of the money orders for whom the security was intended, to enforce such security liens as may exist in the case. These impediments would exist, whether or not the Superintendent could show that the banks in question received notice of the agreement more than four months before bankruptcy.

In sum, the Superintendent has failed to demonstrate that he may assert security liens, perfected prior to filing of the Chapter XI petition, which deprive the bankruptcy court of control over the property in question.

### VI.

The Superintendent challenges the bankruptcy court's summary jurisdiction to determine the turnover application, as well as its jurisdiction over him. Neither challenge is well founded.

#### Summary Jurisdiction

■ Bankruptcy courts have the power to adjudicate summarily and without consent, controversies concerning title to property within the court's possession. That possession, essential to jurisdiction, "need not be actual. Constructive possession is sufficient." *Taubel-Scott-Kitzmiller Co., Inc. v. Fox, supra*, at 264 U.S. 432, 44 S.Ct. 398. One example of constructive possession is "where the property is held by one who makes a claim, but the claim is colorable only." *Id.* at 433, 44 S.Ct. at 399. And

we have noted *supra* that "where a third party in possession claims ownership of the property, the bankruptcy court has jurisdiction in the first instance to determine if the adverse claim of ownership is substantial or colorable"; if the latter, "the court has jurisdiction to adjudicate the claims summarily." 8 *Collier on Bankruptcy* (14th ed. 1976) at ¶ 3.02, pp. 162–163. Judge Galgay concluded that the Superintendent's purportedly adverse claim was colorable, not substantial, and proceeded to a summary adjudication and directed the turnover. We agree.

The Bankruptcy Judge held that, at the time the Chapter XI petition was filed, the Superintendent had neither title to nor possession of UMO's deposits, on any theory advanced by the Superintendent. We have affirmed that holding, and reached a comparable conclusion in respect of additional theories put forward for the first time on this appeal.

■ Consequently upon the filing of the petition these deposits passed, together with UMO's other property, into the *custodia legis* of the bankruptcy court. *Board of Commissioners of Shawnee County v. Hurley*, 169 F. 92, 94–95 (8th Cir. 1909). The Superintendent gained such possession of the deposits as he achieved only by the service of notices and orders upon the banks *subsequent* to the bankruptcy filing. By that time the deposits were *in custodia legis*; no subsequent collection or restraint can give rise to anything other than a colorable claim. The Supreme Court in *Taubel, supra*, referring to "colorable" claims, cited the Second Circuit's holding in *In re Columbia Shoe Co.*, 289 F. 465 (2d Cir. 1923), where a creditor of the bankrupt, who had loaned money to it, collected monies owing by third parties to the bankrupt, seeking to justify such action by alleged security agreements with the bankrupt. The trustee applied for a summary turnover order; the Court of Appeals held such relief to be appropriate:

---

14. *Miller v. Wells Fargo Bank International Corp.*, 406 F.Supp. 452, 477 (S.D.N.Y.1975), *aff'd*, 540 F.2d 548 (2d Cir. 1976).

"Where, however, the adverse claimant cannot show title and has not possession at the time of filing the petition in bankruptcy, his claim to hold money collected after the date of filing a petition in bankruptcy must be regarded as colorable. The mere fact that an argument can be made in favor of a claimant does not render a debated question of law a substantial question. When it appears, as in this case, that under no tenable theory can property in custodia legis be taken by an outsider, then the right to summary determination in the bankruptcy court is clear. The fundamental (but not the only) test is possession." 289 F. at pp. 467–468.

See also *Reifsnyder v. B. Levy & Son*, 88 F.2d 287 (3rd Cir. 1937).

So in the case at bar at the time of filing of the bankruptcy petition, the Superintendent had neither title to nor possession of these deposits. The question of *possession* has already been dealt with. The defect in the Superintendent's *title* arises from the fact that it is the money order purchasers, and not the Superintendent, who are the beneficiaries of any trust arrangements, or the holders of any security interests, that the record may demonstrate. The Superintendent points to no authority, statutory or decisional, conferring upon him the status to assert claims which, *arguendo*, are vested in others. He asserts the practical necessity of his standing, because the purchasers are many and their individual claims few. Such considerations cannot confer legal status or authority where they do not otherwise exist. The Bankruptcy

Judge was correct in concluding that the Superintendent's claims are not only not substantial; on a proper analysis they are not even adverse.

*Personal Jurisdiction*

With equal accuracy, the Bankruptcy Judge characterized the Superintendent as a *receiver*, appointed under California law to preside over the liquidation of licensees if circumstances so require.[15] That is the only characterization which analysis of the underlying California statute permits. It follows that the bankruptcy court had the power to direct the Superintendent to turn over the property. Bankruptcy Act, Section 2a(21), 11 U.S.C. § 11(a)(21). Problems of personal jurisdiction simply do not arise. The bankruptcy court's jurisdiction, which is in part *in rem*, extends over the debtor's property "wherever located", Section 311, 11 U.S.C. § 711, an unlimited geographical concept which carries with it equally unlimited concepts of personal jurisdiction.[16]

## VII.

The orders appealed from are affirmed. It is So Ordered.

15. No criticism is intimated of the Superintendent's efforts in this case. A California official, he is attempting with zeal to obtain advantages for California residents. But state laws which conflict with the federal bankruptcy law must yield, even if passed for purposes other than frustration of that law, *Perez v. Campbell*, 402 U.S. 637, 651, 91 S.Ct. 1704, 29 L.Ed.2d 233 (1971); that is equally true of the actions of a state official, particularly where his manifest objective is to obtain for California money order purchasers, by means of these seizures, a preferential position in relation to purchasers resident elsewhere. That is precisely what the federal bankruptcy law forbids.

16. In *Continental Illinois National Bank & Trust Co. v. Rock Island & Pacific Ry. Co.*, 294 U.S. 648, 683, 55 S.Ct. 595, 609, 79 L.Ed. 1110 (1935), the Court said of a comparable provision in § 77 of the Bankruptcy Act:

"Jurisdiction over the property wherever located carries with it jurisdiction to enjoin, in a proper case, interferences with the property, and this includes, by necessary inference, the power to send process to that end for service upon the persons to be enjoined wherever they may be found within the United States."